# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
*Southern Division*

|  |  |  |  |
|---|---|---|---|
| **DESERT PALACE, INC. dba Caesars Palace, ARIA RESORT & CASINO HOLDINGS, LLC, BELLAGIO, LLC, and THE MIRAGE CASINO-HOTEL,** | * | | |
| | * | | |
| | * | Civil Appeal Nos.: | GJH-15-0091 |
| Appellants, | * | (Consolidated) | GJH-15-0092 |
| | | | GJH-15-0093 |
| v. | * | | GJH-15-0094 |
| **LAWRENCE ANDREW RICH,** | * | | |
| | * | | |
| Appellee. | * | | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Appellants Desert Palace Inc. ("Caesars") and Aria Resort & Casino Holdings, LLC, Bellagio, LLC, and the Mirage Casino Hotel (collectively, "MGM Casinos") appeal the November 26, 2013 Order by the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") dismissing Appellants' claims against Lawrence Andrew Rich ("Debtor"). For the reasons more fully discussed below, this Court affirms the ruling of the Bankruptcy Court.

**I.      Jurisdiction**

The Bankruptcy Court had subject matter jurisdiction over the complaints filed by Appellants pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. According to 28 U.S.C. § 157(b)(2)(I), a proceeding to determine the dischargeability of debts is a core proceeding that bankruptcy courts may hear and determine so long as such matters are referred to the bankruptcy

court by the district court. Pursuant to Local Rule 402, this Court referred such matters to the bankruptcy judges of this District.

This Court has jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges. 28 U.S.C. § 158(a)(1) (2012). Orders dismissing a complaint are final orders. *See Prologo v. Flagstar Bank, FSB (In re Prologo)*, 471 B.R. 115, 128 (D. Md. 2012) ("However, if the grounds of the dismissal make clear that no amendment could cure the defects in the plaintiff's case, the order dismissing the complaint is final in fact, and appellate jurisdiction exists.").

## II.     Background[1]

The Debtor, a long-time gambler who began high-stakes gambling in 2005, generally placed bets from $3,000.00 to $20,000.00 on each hand in Blackjack while simultaneously taking up two positions at the table. In playing Blackjack, the Debtor understood that a casino's winning edge at this game was the smallest of any of the casino games (approximately 50.5% to 49.5% against the gambler).

To facilitate the Debtor's play at their facilities, Appellants allowed the Debtor to activate his line of credit when the Debtor needed chips to gamble. The credit extensions made by the casinos permitted the Debtor to sign credit instruments, known as markers or checks, that were payable on demand in the amount of the credit authorized. When obtaining credit from the casinos, the Debtor signed signature cards which contained language similar to the following from MGM: "I REPRESENT THAT AT THE TIME I SIGN ANY MARKER, I HAVE ON DEPOSIT IN ACCOUNTS ON WHICH I AM AN AUTHORIZED SIGNATORY FOR ALL PURPOSES, WITHOUT RESTRICTION, FUNDS SUFFICIENT TO PAY SUCH MARKER

---

[1] Unless stated otherwise, the facts are taken from the Bankruptcy Court's Memorandum of Decision.

UPON DEMAND OR PRESENTMENT."[2]

The debts that are the subject of this appeal are gambling debts that the Debtor incurred from January 14 to February 27, 2012. The Debtor signed and issued several markers to the Appellants and other casinos, many of which were redeemed. But thirty-two were not. Those markers totaled $2.5 million. Specifically, during this period, Debtor incurred the following gambling debts:

|     | Date    | Amount       | Casino         |
|-----|---------|--------------|----------------|
| 1.  | 1/14/12 | $100,000.00  | Caesars Palace |
| 2.  | 1/14/12 | $100,000.00  | Caesars Palace |
| 3.  | 1/14/12 | $100,000.00  | Caesars Palace |
| 4.  | 1/16/12 | $150,000.00  | Caesars Palace |
| 5.  | 1/20/12 | $75,000.00   | Borgata        |
| 6.  | 1/21/12 | $100,000.00  | Borgata        |
| 7.  | 1/21/12 | $100,000.00  | Borgata        |
| 8.  | 1/21/12 | $125,000.00  | Borgata        |
| 9.  | 1/21/12 | $100,000.00  | Borgata        |
| 10. | 1/28/12 | $21,000.00   | Boardwalk      |
| 11. | 1/28/12 | $100,000.00  | Boardwalk      |
| 12. | 1/28/12 | $50,000.00   | Boardwalk      |
| 13. | 1/28/12 | $50,000.00   | Boardwalk      |
| 14. | 2/4/12  | $129,000.00  | Boardwalk      |
| 15. | 2/4/12  | $50,000.00   | Harrah's       |
| 16. | 2/4/12  | $50,000.00   | Harrah's       |
| 17. | 2/5/12  | $100,000.00  | Harrah's       |
| 18. | 2/11/12 | $50,000.00   | Wynn           |
| 19. | 2/11/12 | $100,000.00  | Wynn           |
| 20. | 2/11/12 | $50,000.00   | Wynn           |
| 21. | 2/12/12 | $50,000.00   | Wynn           |
| 22. | 2/14/12 | $75,000.00   | Bellagio       |
| 23. | 2/14/12 | $25,000.00   | Bellagio       |
| 24. | 2/26/12 | $50,000.00   | Bellagio       |
| 25. | 2/26/12 | $150,000.00  | Mirage         |
| 26. | 2/26/12 | $50,000.00   | Cosmopolitan   |
| 27. | 2/26/12 | $100,000.00  | Cosmopolitan   |
| 28. | 2/26/12 | $50,000.00   | Cosmopolitan   |
| 29. | 2/26/12 | $50,000.00   | Cosmopolitan   |

---

[2] To the extent that Appellants argue that the Bankruptcy Court erred when it found that the Appellants did not rely on this representation, the Court notes that the Bankruptcy Court did not seem to rely on that finding in drawing its final conclusions of law.

| 30. | 2/27/12 | $50,000.00 | Aria |
| 31. | 2/27/12 | $75,000.00 | Aria |
| 32. | 2/27/12 | $75,000.00 | Aria |

On March 8, 2012, nine days after becoming indebted to Aria in the amount of $200,000, the Debtor sent the following message to Caesars:

> I am writing to unfortunately inform you that I will not be able to cover my current outstanding markers due to Caesars Palace, Caesars Atlantic City, or Harrahs [sic] Atlantic City at this time. I want to pay them off and clear this up, but I have recently suffered a series of bad losses coupled with the fact that recent unforeseen problems have caused company cash flow problems and therefore my intended [sic] source to pay off these and other markers at other casinos is no longer available to me at this time. Writing this email is both embarrassing and humiliating. I have suffered numerous substantial losses in the past and have always paid them off on time. Unfortunately, at this time I got in over my head and will not be able to pay right away. I never intended to not be able to pay these markers off when they were due. Please understand that I fully intend to pay these debts over time. However, I am asking that you consider a long term payment plan option in lieu of other action at this time. I believe that my loyalty and good history of payments should warrant this type of accommodation. I would appreciate it if we could talk over the coming days to discuss a plan for resolving this. I am not looking to walk away or ignore this substantial issue.

Consistent with his gambling career prior to 2012, in which the Debtor had covered every marker, he attempted to work out a program to repay his debt to the casinos. But this effort failed when one casino, Wynn's Las Vegas, demanded payment of its marker within one year and the other casinos would not agree to Wynn being paid first. On April 13, 2012, MGM Casinos presented their markers for payment at Sandy Spring Bank, which returned the markers as a chargeback, unpaid, due to the stated reason of a "Closed Account."

On January 20, 2013, the Debtor pled guilty to "Drawing and Passing a Check Without Sufficient Funds in Drawee Bank With Intent to Defraud," which is a Category D Felony under Nevada Revised Statute ("NRS") 205.130 and 205.132. In the plea agreement, Debtor admitted to the following facts:

4

> That LAWRENCE ANDREW RICH . . . on or between January 14, 2012 and February 27, 2012 . . . contrary to the form, force and effect of statutes in such cases made and provided, and against the peace and dignity of the State of
>
> Nevada, did willfully, unlawfully, and with intent to defraud, draw and pass nineteen (19) checks to obtain cash and/or gaming chips, drawn upon Sandy Spring Bank, Account Nos. [], made payable to various gaming establishments located within Las Vegas, Clark County, Nevada, when the said Mr. Rich had insufficient money, property, or credit with the drawee of the instrument to pay it in full upon its presentation.

The Criminal Information then specifically listed each of the debts that are the subject of this appeal plus other debts to other casinos. There is no dispute that the Debtor pleaded guilty to having passed all of the markers identified in the Criminal Information when he had insufficient money or credit with the drawee of the instrument to pay the markers in full upon presentation.

On January 29, 2013, the Mr. Rich filed his bankruptcy petition under Title 11, Chapter 7 of the United States Code in the Bankruptcy Court.

On March 20, 2013, Caesars commenced an adversary proceeding by filing a complaint seeking the Bankruptcy Court's adjudication of the nondischargeability of a pre-petition debt in the amount of $450,000 owed by the Debtor to Caesars. Caesars sought relief pursuant to 11 U.S.C. § 523(a)(6). On May 6, 2013, the MGM Casinos commenced adversary proceedings seeking the Bankruptcy Court's adjudication of the nondischargeability of pre-petition debts in the amounts of $200,000.00 (Aria), $150,000.00 (Bellagio), and $150,000.00 (Mirage), pursuant to 11 U.S.C. § 523(a)(6).

On September 18, 2013, Caesars filed a motion for summary judgment. On October 3, 2013, the MGM Casinos each filed motions for summary judgment. The Bankruptcy Court entered orders in Caesars's adversary proceeding on February 3, 2014, and each of the MGM

Casinos' adversary proceedings on February 13, 2014, denying their motions for summary judgment.

On November 3 and November 5, 2014, the Bankruptcy Court conducted a trial. At the conclusion of the second day of trial, the Bankruptcy Court took the matter under advisement. On November 26, 2014, the Bankruptcy Court entered orders dismissing the complaints in each of the adversary proceedings. In reaching its decision, the Bankruptcy Court found "there is nothing in this record that the Debtor intended to injure the casinos" and "nothing in this record that would cause [the Bankruptcy Court] to imply malice from the Debtor's actions."

### III. Discussion

#### A. Standard of Review

Review of a bankruptcy court's order "regarding nondischargeability is a mixed question of law and fact." *Van Aken v. Van Aken (In re Van Aken)*, 320 B.R. 620, 622 (B.A.P. 6th Cir. 2005). Conclusions of law are reviewed *de novo*. *Lakefront Investors LLC v. Clarkson*, 484 B.R. 72, 80 (D. Md. 2012). Typically, decisions involving mixed questions of law and fact are also reviewed *de novo*. *Rinn v. First Union Nat'l Bank*, 176 B.R. 401, 407 (Bankr. D. Md. 1995). This Court reviews the Bankruptcy Court's findings of fact for clear error. *Id.*; *see also United States v. U.S. Gypsum Co.*, 333 U.S. 364, 394, 68 S. Ct. 525 (1948) ("[F]indings of fact in actions tried without a jury 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge [] the credibility of the witnesses.'"). "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed.'" *Rinn*, 176 at 407 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395).

**B. Dischargeability of Debts Under 11 U.S.C. § 523(a)(6)**

Section 523(a)(6) of the Bankruptcy Code provides that a general discharge of debt in bankruptcy does not discharge a debtor from any debt arising from a "willful and malicious injury by the debtor to another entity or the property of another entity." 11 U.S.C. § 523(a)(6) (2012). "The discharge exceptions are to be narrowly construed in favor of the debtor since the aim of the Bankruptcy Code is to give the debtor a fresh start." *Miller v. J.D. Abrams*, 156 F.3d 598, 602 (5th Cir. 1998). In order to establish that a debt is nondischargeable under 11 U.S.C. § 523(a)(6), a creditor must prove that the act that gave rise to the debt was both willful and malicious. *Johnson v. Davis (In re Davis)*, 262 B.R. 663, 669 (Bankr. E.D. Va. 2001). The standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the preponderance-of-the-evidence standard. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991). "The burden of proof rests with the plaintiffs to establish that their debts are excepted from discharge." *In re Higginotham*, 117 B.R. 211, 214 (Bankr. E.D. Va. 1990).

    **i.    Willfulness**

An injury is willful when a court can determine "that a debtor intended the act and by his or her conduct intended to cause injury." *Id.* To determine whether a debtor intended to injure a creditor, courts may use the "objectively substantial certainty test" or the "subjective motive" test. *Parsons v. Parks (In re Parks)*, 91 F. App'x 817, 819 (4th Cir. 2003). Hence, intent to injure may be established by demonstrating that the debtor took action that caused, or was substantially certain to cause, the injury. *Cissel v. Abell (In re Abell)*, No. 13-13847-PM, Adversary No. 13-323-PM, 2013 Bankr. LEXIS 3322, at *10-11 (Bankr. D. Md. Aug. 15, 2013). It is the debtor's "subjective state of mind that is relevant; it does not matter that a 'reasonable debtor' should have known that his act would adversely affect another's rights." *First Nat'l Bank v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir. 1995). Debts arising from recklessly or negligently

7

inflicted injuries do not fall within § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 64, 118 S. Ct. 974 (1998). When assessing intent, "[i]f the debtor has no idea how the money will get paid back, or if it will get paid back, then he may hope to repay—he may even want to repay—but he certainly does not intend to repay." *LA Capitol Fed. Credit Union v. Melancon (In re Melancon)*, 223 B.R. 300, 321 (Bankr. M.D. La. 1998).

> Most critically, the Bankruptcy Court found in this case:

> [T]hat when the dust settled, the Debtor saw the magnitude of his loss, he intended to repay the casinos, albeit not as quickly as one entity wished. There is nothing to indicate that he intended to injure any one of the creditors, particularly at the time he signed the markers or at any time before or after. Throughout the period covered by this adversary proceeding, he had numerous sessions when he won and redeemed his markers, and there is nothing to indicate that he would have done otherwise with respect to the markers at issue. Furthermore, the court finds nothing in this record that would cause it to imply malice from the Debtor's actions. There are no surrounding circumstances to lead to the conclusion and certainly no evidence of any motive to cause harm to the casinos by using markers. There is nothing to show that he intended to use the chips improperly, such as by selling them to another gambler at a discount. He procured the chips for the purpose for which they were intended -- to bet with. And, bet he did.

ECF No. 27-1 at 19-20.[3] This Court can certainly find no clear error with these findings. To the contrary, they are amply supported by the record and this Court agrees with them. Specifically, the Debtor's intent to repay the casinos is demonstrated by the message he sent to the casinos, *see id*. at 16 ("I never intended not to be able to pay these markers off when they were due. Please understand that I fully intend to pay these debts over time"), and in instances where he won and did repay his markers, *id*. at 133-34 (Debtor testifying that he paid a marker of $150,000 during the time when he was accumulating significant losses).

Additionally, Appellants claim that the Bankruptcy Court did not properly consider the Debtor's plea in Nevada in making findings related to the issue of willfulness is refuted by the Bankruptcy Court's decision and the evidence presented. The Bankruptcy Court negated the

---

[3] Citations to specific pages are to the page numbers assigned on the ECF docket.

import of the plea because, as it stated, "the Debtor pleaded guilty on January 30, 2013, to the Information to avoid imprisonment, as there is no possible defense to this strict liability statute." ECF No. 27-1 at 17. This is also amply supported by the record. *See* ECF No. 27-1 at 142-44 (Debtor testifying that he pleaded guilty because he was told that if he did not he would go to jail). Thus, the Bankruptcy Court did not ignore the evidence of the plea colloquy in Nevada but rather gave it consideration and accorded it less weight given the contextual evidence.

Based on these factual findings, which the Court agrees with, the Court is compelled to agree with the Bankruptcy Court's legal conclusion that "if [debtor] caused harm to the casinos, in the light of the surrounding circumstances, that harm could not be said to have been substantially certain to result." ECF No. 27-1 at 20. At every point along the way, Debtor was trying to win enough money to pay back his markers. His approach may not have been what a "reasonable debtor" would have done but it was not substantially certain to cause injury. Appellants' arguments to the contrary are unpersuasive. Indeed, in its brief, Caesars makes the extraordinary statement that "[e]very time [] the Debtor gambled after leaving Caesars, he was substantially certain that he would lose, as the Debtor has acknowledged that the gambling odds were never in his favor." ECF No. 19 at 37-38. While the Court recognizes that casinos do not use their marketing executives to craft their legal arguments, the notion that Debtor was "substantially certain that he would lose" every time he gambled would seem to fly in the face of the reason that millions of people flock to casinos every year. More to the point, the evidence before the Bankruptcy Court was sufficient for the Bankruptcy Court to reject that argument. *See, e.g.,* ECF No. 27-1 at 132 (Debtor testifying about winning $250,000 and $223,600 at Aria on two separate occasions). Specifically, Debtor testified that he believed the odds of winning at Blackjack were in favor of the house but only by a rate of fifty and a half to forty-nine and a half.

9

*See* ECF No. 27-1 at 162. Thus, while the Court will not attempt to assign a percentage value to the term "substantial certainty," it would likely require something more than 50.5 percent.

Appellants further argue, however, that the appropriate analysis does not focus on any specific wager but instead the complete picture of the Debtor's actions in the sixty day period after signing the markers as that is the period that reflects the casinos' right to receive timely payment in full on demand. *See Bombardier Capital, Inc. v. Tinkler (In re Tinkler)*, 311 B.R. 869 (Bankr. D. Colo. 2004) (considering both the initial act of conversion and the period of subsequent failure to turn over the proceeds to provide the basis for a § 523(a)(6) cause of action). Appellants assert that the Debtor should have ensured that sufficient funds were available to repay all markers at all times after he took them out. Instead of doing so, they argue, the Debtor's acts throughout this period made it substantially certain that he would not be able to timely repay, or to repay at all. The court does not agree.

Even assuming for the sake of argument that Appellants are correct and the appropriate analysis focuses on the entire sixty day period, the result is the same. Appellants' joint reply brief identifies sixteen separate actions it contends Debtor took during the sixty day period to demonstrate that he acted willfully and maliciously. *See, e.g.,* ECF No. 29 at 17-18. But all of these acts go to the same core storyline of this case: the debtor continued to incur debt so that he could continue to gamble in hopes of winning and repaying his debt; but he ultimately failed. The Bankruptcy Court found that the Debtor believed he would turn it around and pay off his debts. Based on the record below, this Court agrees and finds that the harm done to the Appellants was not willfully done.

### ii. Malice

Likewise, the record before the Bankruptcy Court does not support a finding of malice. The Fourth Circuit defines malice for purposes of evaluating the dischargeability of debt under 11 U.S.C. § 523(a)(6) as "causing injury without just cause or excuse." *In re Davis*, 262 B.R. at 670. A debtor may act with malice "without bearing any subjective ill will toward plaintiff creditor and without having any specific intent to injure the creditor." *Id.*

Specific malice is not required on the part of the debtor. *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008 (4th Cir. 1985). If malice is not express, implied malice "may be shown by the acts and conduct of the debtor in the context of their surrounding circumstances" to establish malice under § 523(a)(6). *Id.* at 1010. The creditor can establish malice on an implied basis, through facts evidencing the debtor's behavior and surrounding circumstances. *In re Davis*, 262 B.R. at 671.

The Bankruptcy Court found nothing in the record that would cause it to imply malice from the Debtor's actions. Nor does this Court. It may have been reckless to continue to gamble beyond his ability to repay the casinos immediately, but there is no evidence of malice, express or implied. He continued to gamble based on his belief that his luck would change and he would repay his debt. He was wrong but not malicious.

### C. Collateral Estoppel

Finally, Appellants argue that Debtor's guilty plea in Nevada for the same facts should preclude him from denying that his acts were willful under the theory of collateral estoppel. Collateral estoppel, or issue preclusion, bars re-litigation of an issue "previously decided if the party against whom the prior decision is asserted had 'a full and fair opportunity to litigate that issue in the earlier case.' Collateral estoppel treats as final only those issues 'actually and necessarily determined' in the prior suit." *Combs v. Richardson*, 838 F.2d 112, 114 (4th Cir.

11

1988) (citations omitted). "Issue preclusion can be applied in a dischargeability adversary proceeding. When a party attempts to assert that a state court judgment carries preclusive effect, 'the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel.'" *Reed v. Reed (In re Reed)*, Adversary No. 12-21819, 12-629, 2013 Bankr. LEXIS 5180, at *18 (Bankr. D. Md. Dec. 11, 2013). In Maryland, the creditor must establish that

> (1) the issues presented by the Dischargeability Complaint are identical to those raised in the prior adjudication; (2) the issues actually litigated were essential to the judgment in the prior adjudication; (3) a final judgment on the merits was entered in the prior litigation; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication.

*Id.* at *19. A trial is not always necessary to find that an essential issue "was 'actually litigated.' What *is* important is whether the party against whom the findings are asserted was afforded fundamental due process – notice, an opportunity to be heard and motivation to protect one's rights – before the finding was made." *Id.* at *20 (emphasis in original). Since nondischargeability must be proved only by a preponderance of the evidence, "all creditors who have secured fraud judgments, the elements of which are the same as those of the fraud discharge exception, will be exempt from discharge under collateral estoppel principles." *Grogan v. Garner*, 498 U.S. 279, 285, 111 S. Ct. 654 (1991).

Appellants argue that the Debtor's plea in Nevada to "Drawing and Passing a Check Without Sufficient Funds in Drawee Bank With Intent to Defraud" should be given preclusive effect here. Specifically they cite to *Cheeks v. Taylor (In re Taylor)*, No. 07-18102-TJC, Adversary No. 07-1003-TJC, 2009 Bankr. LEXIS 3336 (Bankr. D. Md. Oct. 2, 2009). Notably, however, in *Taylor*, the debtor was convicted in state court of larceny and the provision being adjudicated was 11 USC § 523(a)(4) which specifically prohibits a discharge resulting from a larceny. Here, the crime pleaded to in Nevada has different elements and requirements from §

12

523(a)(6). Indeed, appellant counsel seemed to acknowledge to the Bankruptcy Court that because this was not a § 523(a)(2) case, which expressly addresses fraud, the Debtor's willful act addressed in the Nevada case may have been one of any number of acts. *See* ECF 27-2 at 77 ("What other willful acts could it have been? It could have been passing bad checks. . . . It could have [been] knowingly incurring gambling losses that would have assured you that you had no ability to pay. It could have been a breach of contract . . . . Our focus is not on fraud, our focus is on his willful intent to cause harm."). In the Nevada case, the debtor did not admit that he willfully intended to cause harm thus the issues presented were not identical and collateral estoppel does not apply.

**IV.    Conclusion**

Based on the foregoing, this Court AFFIRMS the Bankruptcy Court's order to dismiss the complaints brought by Caesars and MGM Casinos.

Dated:  September    30  , 2015                         /s/
                                                GEORGE J. HAZEL
                                                United States District Judge